Good morning, Your Honors. May it please the Court, my name is Peter Davids. I represent Appellant Anthony Davis. I'd like to reserve at least one minute for rebuttal. My client was sentenced to 38 years to life after a trial in which there was less than three hours of testimony. No witness to the events at issue testified at a trial. All of the testimony, except for one medical expert, all of the testimony was in the form of hearsay statements made by the alleged victim, Ella Alexander, and her mother. The key hearsay was recounted by San Francisco Police Sergeant John Sanford, who interviewed Alexander in a hospital room some eight hours after the incident, as she was recovering from a skull fracture and a bout of heavy drinking. The prosecutor relied extensively on Sanford's testimony in closing arguments, and the jury asked to have Sanford's testimony re-read to them not once but twice. Now, the California Court of Appeal affirmed Mr. Davis's conviction, finding that Alexander's statement was trustworthy enough to satisfy the confrontation clause because she had been drinking heavily, had suffered a head injury, and had undergone emergency medical treatment. Now, this was an objectively unreasonable application of clearly established Supreme Court precedent. This case is governed by the pre-Crawford Confrontation Clause jurisprudence of Ohio v. Roberts, and it's clearly established under Ohio v. Roberts and Idaho v. Wright that the prosecution may introduce hearsay in a criminal case if it falls under a firmly rooted hearsay exception. If the hearsay does not fall under a firmly rooted exception, however, it is presumptively unreliable and inadmissible. In that case, the prosecution has a burden of coming forward and showing affirmative particularized guarantees of trustworthiness. Those guarantees have to be so strong that cross-examination would be largely superfluous. Here, Sergeant Sanford's testimony regarding Alexander's statement was admitted pursuant to California Evidence Code Section 1370, but that's a non-firmly rooted exception. In fact, it was not even enacted until 1996. In addition, the prosecution made no showing whatsoever of particularized guarantees of trustworthiness. The prosecutor simply handed a transcript of the interview to the trial judge who reviewed it and concluded it was trustworthy. Now, as I noted, the California Court of Appeal found that Alexander's statement was trustworthy because she had been drinking heavily, had suffered a head injury, and had undergone medical treatment. Now, the very factors the California Court of Appeal relied on preclude a finding of inherent trustworthiness. The Supreme Court has specifically held that alcohol consumption does not increase a witness's reliability. Rather, it, quote, "...militates against a finding that the declarant's statements were so inherently reliable that cross-examination would have been superfluous." And that's Lilly v. Virginia, 527 U.S. at 139. And for good reason. The effect of alcohol on one's ability to fabricate is dubious at best. Where it has an effect that's indisputable is on one's perceptions, on one's memory, on one's ability to narrate accurately. In short, on one's ability to be a reliable witness. Likewise... by the Court of Appeal included the fact that it was in relative proximity to the attack and that the statement was tape-recorded. Right. And I don't think those, or those definitely do not constitute particularized guarantees. This was eight hours after the incident. Alexander, she was on the phone with a 911 dispatcher, or at least was giving information to a 911 dispatcher. She was interviewed at the scene by Officer Salazar. She rode to the, and spoke to paramedics. She rode to the hospital with Officer Salazar in the ambulance. She had seven hours in the emergency room in which she received bandages and CAT scans and x-rays. This was eight hours after the fact. So it was quite a time after. The tape recording of the statement doesn't, you know, it doesn't show that it was trustworthy. It just shows what she said. Now, I would posit that if a, if your honors were sitting at a trial court level and a witness came into your courtroom who was drunk and who had suffered a serious head injury, you, I suspect you would not let her take the stand. But if you did allow her to take the stand, you surely wouldn't rule that her testimony was so trustworthy that cross-examination was unnecessary. And simply the fact that Alexander was in an emergency room prior to her interview doesn't add or detract from her trustworthiness. So I think if we look at the totality of the circumstances here, Alexander was injured and under the influence of alcohol. She never told the same story twice. Her statement was internally inconsistent. And it conflicted with her statements to Officer Salazar at the scene. And especially on the issue, the key issue of what she was doing with a knife. She was inconsistent on that. At first she said she had a knife in her hand. And then when Sergeant Sanford questioned her further, she said,  And then when he questioned her some more, she said, Oh, yeah, I didn't get a chance to use that knife. She also couldn't explain how she had received contusions on her arms or a laceration on her thumb. She also had plenty of motive to lie, given her understandable anger at Mr. Davis, and also given her potential liability or culpability for having used a knife during the incident. So even if we were to assume as a trial court, or as the California Court of Appeal did, that her ability to fabricate was impaired, one simply cannot say she is a trustworthy witness, because her alcohol use and her injury cannot but have affected her perceptions. Now, the error in admitting Sergeant Sanford's testimony was harmful under Brecht versus Abramson. It was by far the most detailed account of the events at issue. The prosecutor, in fact, it was really the only clear testimony that Alexander was seated during the incident, and that was crucial to defeating the self-defense case. The prosecutor relied extensively on Sanford's testimony during closing arguments, and as I mentioned, the jury asked to have it reread to them twice. In these circumstances, one simply cannot say the error is harmless, and I would point the Court to its decisions in Arnold versus Runnels, and also in Jackson versus Giorbino. Now, we all know AEDPA sets a high bar and requires a great deal of deference to state courts, but as this Court held in Anderson sitting on bunk, as this Court held on bunk in Anderson versus Terhune, AEDPA is not a rubber stamp for strained and dismissive interpretations. Here, concluding that Alexander's testimony bore particularized guarantees of trustworthiness, because she was drunk, because she had a head injury, is just objectively unreasonable. It was not just a violation of my client's confrontation clause rights, but a gross violation, and he deserves a new trial. Unless Your Honors have questions, I would like to reserve the rest of my time for rebuttal. Thank you, counsel. Thank you. Good morning, Your Honors. May it please the Court. I believe that appellant confuses credibility issues and that are presented to the jury with reliability. Here, the Court admitted the statements under California Evidence Code Section 1370, which specifically put forth rules and conditions to ensure reliability, and the Court went through all those factors in making its decisions. The statement was recorded. It was made to a police officer. Why does it make it reliable, the fact that it was recorded? What does that show, tell us about reliability? Well, it ensures, because it's hearsay. Of course, one of the most difficult things about hearsay is we have to question whether what the other person says that this person said was actually what they said. I tell this, from that we can understand or know what she actually said. Exactly. We know that the officer isn't putting words in her mouth. The officer isn't making his own interpretation of her words. We know exactly what her words were. So that's one factor that they record. What about being drunk? I just don't understand why being drunk is an indicia of trustworthiness. Well, first of all, Your Honor, I think that the fact that the statement or that she was drunk is not clear from the evidence. It's clear that she was drinking. She admitted that she was drinking. The officer said he didn't smell any alcohol on her when he got to the scene. The California Court of Appeal relied on that factor and said, here are the five reasons why this statement is trustworthy, and number four is she had been drinking heavily. That leaves me puzzled. So could you explain to me why drinking heavily would increase the trustworthiness that we should attach to it? Well, certainly I think what the court was looking at was the ability of the witness to contrive and to fabricate because one of the big issues in this case is did this witness, was she lying? Was she making it up? And that's what you're concerned about is that someone is going to lie about what happened. That's why we allow spontaneous statements, and why 911 calls are reliable because in the excitement of the moment, the person doesn't have time to fabricate and come up with a story. And I think the court was looking at it in that aspect of that, that she was being treated for a very serious head wound, that she actually, I think if you listen to the recording at the scene when the officers are, excuse me, in the 911 call, I believe the court has that. And if you listen, there's even one point where it sounds like she believes that she's dying at the time. And so in those types of situations. The 911 call is a different situation. I don't think, for example, you take somebody at the scene of a normal DUI, I think the officers generally, the statements made there are not considered especially trustworthy about how much the person's had to drink or any of those things. Being drunk generally isn't considered to enhance trustworthiness of statements. But I think, Your Honor, again in this situation, what we're looking at is her ability to fabricate and make up a different story. She may not have all the details correct, but here the officer is trying to get basic parameters of what occurred at the scene, and she was able to tell him that. The point is more than fabrication. The point is whether or not what actually happened, perceptions. In other words, if somebody has misperceived an event, that statement may be untrustworthy. So you have somebody who's impaired either by alcohol, and there's a suggestion there might have been cocaine involved. You have a head trauma. That doesn't seem, I don't want to quarrel with you, but it just struck me as an odd reliance by the California Court of Appeal in saying that this increased the trustworthiness of this particular statement to the point where we don't need to subject it to cross-examination. Well, again, Your Honor, I believe that the court was looking at the situation of someone who was under the excitement of a situation and hasn't had time to really reframe. It may be that some of her perceptions of everything that occurred were not, she may not remember exactly like how many times someone hit you in the head, because obviously once you're hit in the head, you're going to be stunned. But the basic parameters of what occurred, she was able to recall and state. And there's no room, again, she didn't have time to fabricate or to make up a story about who did it. And I think also... The mother made a statement at the scene, didn't she? The mother made a statement at the scene. What role did the mother's corroboration of the daughter's later statement play here? Well, I think it certainly, I mean, if you're going to look at harmless error, I think it's very important. I mean, I think that you have, when you look at the 911 call and when you look at the mother's statements at the scene, it certainly corroborated what the daughter was saying. And also, just in terms of the harmfulness of the statement, even if the statement was erroneously admitted, the fact is the jury was aware of all the various stories that the victim gave. The jury was aware that the victim didn't show up. The jury was aware that the victim recanted. The jury was aware of her subsequent statements. So the jury was able to make that determination. And at the 911 call and the statements at the scene I think are clearly spontaneous statements. And the mother certainly corroborates what the daughter said. The mother heard the arguments. The mother ran downstairs. She said she tried to separate the two and the victim sat down on the couch and the defendant hit her on the head with a hammer. Also corroborated, the 911 call was corroborated by the fact that the mother called on a speakerphone and the defendant ran out of the house with the telephone, further showing that he was attempting to prevent the victim from getting any help. Now, one of the things that troubled me a little bit when I was looking at the record here is I understand the California court's suggestion that because she was hit in the head and because she was at least to some degree inebriated, that she would have had less opportunity or propensity, if you will, to fabricate a story. I think that would have been a much stronger argument had they talked to her at the scene or within a few minutes, but it was eight hours later and who knows what opportunity she had to fabricate over eight hours. I mean, that's a long time. Well, Your Honor, first of all, they did talk to her at the scene. Well, I know, but that's not the statement we're talking about. When we're talking about eight hours, it's eight hours from when the police first actually walked in the door. So at the time the police walked in the door, the victim is bleeding profusely. She's in pain. The paramedics have to come. I mean, there's unfortunately no chronology that we have to tell us exactly what time the paramedics arrived, what time she was actually stabilized. But the case statement we're talking about is several hours later. Exactly, Your Honor, but it was right after she was in the process of finally being taken from the emergency room out of the trauma room. So she had been treated. I recognize this may have been the first opportunity that they had to get to her after she had been brought there, but still, I mean, it is a little troublesome from my perspective to suggest that somebody, because of their inebriation, which, by the way, over time is going to wear off, right? I mean, common sense tells you that if she'd had some drinks at 2 o'clock in the afternoon, I'm just using a time period, by 9 o'clock at night, she's not going to be as drunk, right? So, and that's regardless of whether she got conked on the head or not. So I think, I don't think it's a foregone conclusion that just because she had had some alcohol much earlier that she would be incapable of formulating some kind of a cock and bull story. Well, I think the difference, though, Your Honor, is that he or she did also suffer a very serious head injury that she was being treated, and if you listen to the recording of that interview that morning, there are several times through that interview where she's crying out in pain. The interview was interrupted several times by medical personnel. So she is still in severe pain despite being treated, and I urge you to listen to the recording and to listen to the parts where she's crying out in pain, where she's crying, and... The other thing that bothers me about this, and of course we understand we looked at it through the EDPA lens and so forth, but as Judge Edgeworth points out, this was eight hours later, so arguably she's not as drunk, which would maybe cut in the State's favor, but the California Court of Appeals says, no, she'd been drinking heavily, and that's what gives the statement its indicia of trustworthiness. It's unlikely, it seems to me, that she was probably... I mean, she certainly wasn't as drunk eight hours later as she was at the scene. So it doesn't quite add up to me what the rationale of the California Court of Appeals is. Well, I think that was one factor that the Court of Appeals relied on. I think the Court of Appeals relied on several other factors. You've got eight hours after the attack, which does give her time to fabricate. She was lying on a gurney being moved from a trauma unit. She had visible head trauma, and she'd been drinking heavily. That's basically what they said. Well, again, Your Honor, I think that the fact that it's eight hours later, under these circumstances, I don't think that there is a set rule, a mechanical rule that says the amount of time. I think you have to look at the totality of circumstances. And again, looking at the ability to fabricate, this is a woman. And again, the eight hours is from when, excuse me, when the police fully arrived, and she's being treated at the scene. She's at the hospital. She's in extreme pain. She suffered a very, very serious head injury. She's bleeding profusely. I don't think it's reasonable to say under those factors that while she's undergoing this extreme trauma, as she has medical personnel working on her, she continues to be in severe pain, as clearly indicated in the recording of the statement where you can hear her screaming out in pain and where medical personnel have to come in and interrupt the interview. I disagree with you that that just because it's eight hours, that that would be time for her to contrive and fabricate a story under those conditions. Your argument was it was at the time, and therefore she didn't have time to. And I think the fact that the passage of time would cut, perhaps cut the other way. I don't dispute the fact that she was in pain, and that may well have been a factor the Court should have relied on. But the other thing that the confrontation clause protects is not just fabrication, but it's misperception at the time, so whether events happen accurately. You have to say someone who's been hit in the head and who's impaired and in pain may or may not remember accurately whether you have a knife or not, which is sort of vital to the self-defense assertion, right? I mean, she may have been entirely correct in her own mind in trying to remember what happened, but she may not have been able to remember it with any specificity. And it's not just fabrication that's protected under these circumstances. It's the trustworthiness of the statement itself from this misperception or misinterpretation. Well, again, Your Honor, I think under the circumstances, I think any time that would call into question. She did tell Stanford that she had a knife, correct? Yes, she did. I mean, that would seem to suggest that, you know, why would she sort of incriminate herself in some way? Exactly. I mean, to me, she – it would cut against her own interests if she had the ability to contrive or think about it. I mean, I think she's being accurate, and it certainly shows, I think, an indication of reliability that she's willing to say, I had a knife, and this is what occurred. I also think there is something about the situation in which she is in pain that she – it's trustworthy in that I don't think she is sitting there trying to make up a story. I think she's trying to recognize or trying to answer the questions as accurately as possible. And again, what she said is corroborated by what was said at the scene and by what her mother said. And finally, the jury, of course, has heard all these various statements. The jury knows – the jury is fully aware that she recanted. The jury is fully aware of her subsequent story. And so I don't think that, in the end, under breath, that even if it was erroneous to admit it, that there was any harm. Our question came up over your time, if you want to sum up. Well, Your Honor, I think the circumstances of this case where – especially given the 911 call and the statements at the scene, I think this is a very strong case regardless of that what the victim said to Stanford was accurate. I think the statements later, after five months, when the victim reconciled with the defendant is biased and has – she certainly had a motive. And certainly she had plenty of time then to tell her own story through the defense. And it's inconceivable that she would have told any other story on cross-examination, I think, because this is a story that she subsequently said. And the jury was apprised of her subsequent statement of what occurred. So with that, we're prepared to submit, Your Honor. Thank you, counsel. We'll give you some time for rebuttal. I'd like to agree with Judge Ezra's point that this was eight hours later, and in some ways Alexander was the worst of both worlds in terms of reliability. At the time of the incident, she had been heavily drinking and she was injured, and this would have affected her perceptions and her memory. Eight hours later, she would have been sobering up, and that would have allowed her time to – Well, what about the corroborative effect, counsel, of the 911 call and the statement of the mother? What about that? I mean – Under Idaho v. Wright, in analyzing the trustworthiness of a statement, seeing if it's trustworthy enough to satisfy the confrontation clause, you have to look at that statement. You can't bootstrap in other evidence from trial. And in fact, the statements were not consistent in many regards. There were inconsistencies about whether the mother was upstairs or downstairs or inconsistencies about statements. Was there any evidence in the record showing who had – who communicated with her after she was removed from the residence? There is evidence in the record that Sergeant Sanford rode to the hospital in the ambulance with her. And did he ever – was there any evidence that they had a discussion about what happened in that ambulance? No. No. How about at the hospital? Was Sanford the only one to have – to speak with her? Other than the doctors, medical personnel? There isn't any evidence in the record other than Sergeant Sanford riding with her, and then – I'm sorry, Officer Salazar riding with her, and then Sergeant Sanford arriving the next morning to interview her. And again, eight hours had passed. The only evidence of medical treatment in the record is X-rays, CAT scans. This was a head injury. She would have spent much of the time under observation in an urban emergency room. At the end of the day, though, why isn't any error harmless in this case? You have – I know your argument that this was the only direct evidence, but on the other hand, you have the statements of the medical personnel. You have the mother's statement at the time. First of all, I think under this Court's precedence, Arnold v. Reynolds and Jackson v. Jierby, you know, you simply cannot say a statement is harmless when the prosecutor relies on it in closing and when the jury asks to hear it reread to them twice. This was a key testimony by Ella Alexander, the victim in the case. Now, the whole point of the Confrontation Clause, or the central concern, is to ensure the reliability of testimony. Here, the jury never had an opportunity to assess Alexander's demeanor or her credibility. If she had come into court and given the same statement she gave to Sergeant Sanford, the defense would have cross-examined her about her perceptions, her recollections, contradictions in her statement. If she had come in and given a statement exculpating Mr. Davis, then the prosecution would also have cross-examined her at length. In either case, her credibility as a witness would have been shot. Instead, her testimony came through Officer Salazar and especially Sergeant Sanford, law enforcement officers. And in discussing the right of confrontation, this Court has specifically identified, quote, the danger of law enforcement in premature when testimony from a shaky witness is elicited from a police officer. Did they play the tape during the trial? I didn't see that. No. They did not. That's a little odd. Right. The judge felt that because some parts of the interview may be admissible and some parts inadmissible, so the jury never did actually hear her voice. No. The jury never heard her voice, never read the transcript. Sergeant Sanford sat on the stand and just recounted her testimony. But I assume there's no dispute that he recounted it accurately because you heard or somebody heard the tape and didn't object to it. There were some things he said which were inaccurate, but I don't think they were on key. The tape was presented to the district court, correct, in the habeas proceeding? Correct. And just to address your point, Judge Paez, about the fact that she admitted using a knife, in Williamson v. United States, the Supreme Court stated, one of the most effective ways to lie is to mix falsehood with truth. Alexander would have known that the police would likely find a knife at the scene. There is a photograph of the knife in our motion to supplement the record. And her testimony about it is very, very cagey. I think if you listen to the interview, if you read the transcript of the interview, she first says she had a knife in her hand, and then when Sergeant Sanford presses her on it, she backs up and says, well, actually, I think it may have been under the couch at the time. I really don't remember. And then she goes on to state more definitively, no, I never got a chance to use it. Oh, and I did tell Officer Salazar about the knife at the scene. And this was kind of the key, you know, the key kind of information or the key facts relating to the self-defense claim. Did she have a knife? Was Mr. Davis using the hammer to knock the knives out of her hand, or was he just using it to hit her? So I think for all these reasons, one simply cannot say this testimony was harmless. Thank you, counsel. Thank you. The case is here to be submitted. Thank you both for your arguments and your briefs.
judges: Thomas, Paez, Ezra